## THE SMYRNA, LEIPSIC & PHILAD'A. STEAMBOAT CO. *vs.* WILMON WHILLDIN.

Vessels, like carriages, meeting must, in general, keep to the right, unless circumstances, as of wind or tide, would · render it improper. Having sufficient room to pass, neither is bound to go out of the way to get to the right.

These rules seem to be settled in reference to collisions, and questions of liability arising therefrom.

*It seems* that a vessel having the wind free, must get out of the way of one that is close hauled.

A vessel on the starboard tack may keep her wind; a vessel on the larboard tack is bound to bear up, or heave about to avoid danger.

The vessel to windward is to keep away to avoid collision, when both vessels are going the same course in a narrow channel.

A steam vessel is regarded as having a wind, and is bound to give way to a vessel with sails.

The *usage* is for vessels having the tide to keep further out; those stemming tide nearer the shore; and this usage will be considered in questions of collision.

Vessels are bound to provide proper pilots, look outs, lights, &c., and are responsible for accidents resulting from the want of such care.

Trespass on the case is a proper form of action for a collision caused by such neglect.

Exemplary damages may be given for a wilful collision.

For mere negligence, or want of skill the damages are compensatory only ; such as will restore the injured vessel to her former condition; but not for detention, loss of profits, &c.

In case of *mere* accident, it is damnum absque injuria, and neither party can recover.

KENT, April term, 1845. This was an action of trespass for running down the steamboat "Kent" by the defendant's steamboat the "Sun."

These steamboats were proceeding in opposite directions on the night of the 4th of July, 1844, and met in the river near Gloucester Point, when a collision took place; the Sun striking the Kent on the larboard side, and sinking her. The evidence as to the causes of the collision was conflicting. · The plaintiffs' evidence was designed to show that there had been some rivalry between the boats in the morning about the wharf at Chester, which was taken by the Kent; that she was returning at night well lighted up, on an ebb tide, well out in the river, with proper look outs and due caution; when the Sun suddenly appeared on the left side bearing down upon the Kent and holding her course several minutes after the bell was rung, when she might have avoided the stroke; that the Kent sunk in about half an hour, to the great danger and alarm of the passengers, to whose rescue the defendant did not come promptly, though he in fact rescued them all.

The defendant's evidence, on the contrary, was designed to show that there had been no rivalry between these boats; that his boat was returning with proper lights and look outs, and under express orders to keep near the western shore, out of the tide, and to run slowly for fear of injury to small pleasure boats; that being within a few feet of the shore as he turned the point, he suddenly came upon the Kent crossing his bows, and heading in for shore; that the collision was inevitable and occasioned by her being entirely out of place, and that the defendant did all in his power to rescue the passengers, his efforts being embarrassed by the misconduct of his own passengers in throwing overboard planks, &c., which got into and obstructed the wheels of his boat.

In the argument before the jury, the plaintiffs' counsel contended,

1. That the law of the sea as well as of the road, was "keep to the right;" or if varied at all by the wind or tide it was this, that vessels sailing *on* a wind (and steamboats always) are bound in meeting other boats, to port the helm, and pass to the right. (3 *Kent Com.* 231; *note; Westm. Review*, Sept. 1844, p. 61.)

2. That if *usage* could change the general law, no sufficient usage to the contrary was proved in this case; and no usage could excuse the running down a boat, though out of her proper track.

3. They claimed damages from the defendant on the ground of *negligence :* 1st. For not backing his engine when he saw the Kent. 2d. For not employing a competent night pilot, as Garretson, though a good day pilot, was from defect of sight, unfit to pilot the boat at night. 3d. For not keeping competent look outs, as Cobb, the look out, admitted he did not see the Kent until she was within ten feet of them; and 4th. Because the pilot, Garretson, by his own confession, mistook the lights of the Kent for lights on Windmill island. (5 *Carr. & Mar.* 236.)

They claimed as the measure of damages, the cost of repairing the Kent; the loss of time and profits she would have made in her usual business; the injury to the owners by diverting passengers into other channels; and the loss of passengers' baggage, for which plaintiffs were responsible. They estimated the damages on the ground of negligence at $2,130.

4. They claimed exemplary damages if the jury should consider the collision to have been intentional and designed, not to run the Kent down, which they did not charge, but to "hit her a slap" for taking the wharf away from them at Chester. (4 *Harr. Rep.* 483; 41 *Com. L. Rep.* 196; 1 *Cromp. & Mea.* 29.)

The defendant's counsel contended :—

1. That the law of the road was not the law of the river; and that the general rule of "keep to the right" had no application to vessels passing in the Delaware, as to which a usage was fully proved for vessels going with the tide to keep out in the strength of the tide, while vessels stemming tide hugged the shore. They denied that even the law of the road would authorize a person to go out of his way to jostle a passenger who was on the wrong side, if there was room to pass. (3 *Harr. Rep.* 317-18; 5 *Esp. N. P. Rep.* 43; 2 *Ibid* 533, 685.) The law of the road grows out of the custom of the road; in England it is to pass to the left; in this country to pass to the right; the law of the river must equally depend on the custom of the river, and that custom is not to keep uniformly to the right or to the left, which would be impracticable; but to go as common sense and reason dictate, the boat stemming tide near the shore, and the boat having the tide, out in the strength of the tide.

2. That there was no evidence that the collision in this case was the result of design or of negligence on the part of the defendant; on the contrary, that it was caused by the negligence or unskilfulness of the plaintiffs' boat.

3. That in relation to damages neither the profits of the voyage or business, nor the loss of passengers, could be considered; for these were too uncertain and fluctuating. (*Cond. Sup. Ct. Rep.* 329, 699.)

4. Conceding that the form of action was proper, and that plaintiffs might sue either in trespass or case, they contended that the rule of damages was different in the two actions; and that in trespass the plaintiff could recover only for direct and not for consequential injuries; and nothing by way of exaggeration or example. (1 *B. Mun. (Kent'y.) Rep.* 80.) The only exception is for trespass, assault and battery, which stands upon peculiar grounds as a personal wrong.

*By the Court:*

BOOTH, *Chief Justice*, charged the jury.—He cautioned the jury against influences from extraneous remarks about "soulless corporations" or "public excitement." Corporations are collections of individuals entitled to the same protection to property in their aggregate or corporate capacity, as they would have in their individual capacity. The jury have nothing to do with "public excitement;" it is to have no influence on their verdict. Neither ought it to have any influence that the defendant is a "stranger" and not a citizen of this State. He trusted that before a Kent jury these considerations

could have no weight; nor any other considerations apart from the merits of the case, on the law and evidence.

He stated the case to be this:—Two steamboats, not rivals, no bad feeling, but the contrary, among captains or hands, on the 4th of July last, making excursion trips, the one to Philadelphia from Smyrna, the other from Philadelphia to Wilmington, met at Chester. The Kent got the wharf: was there any thing in this to cause rivalry or bad feeling? No object to get passengers, for the boats were running in different directions; nothing in this as proved to cause offence. The boats each returned that night; the Sun going up against an ebb tide, the Kent going down. They met near the Point-house; struck; and the Kent was sunk. Whose fault was this? If of the Sun the plaintiffs ought to recover; if otherwise, the verdict should be otherwise.

The injury must have resulted either 1st, from the defendant or his pilot (and it is no matter which, for the defendant was on board and is responsible for his pilot) wilfully running into the Kent; 2d, from his negligently running into the Kent; 3d, from the captain or pilot of the Kent running foul of the Sun through carelessness or ignorance; or 4th, the injury may have resulted from accident, without blame of either.

1. Did the injury arise from the intentional act of defendant? The evidence on this subject is circumstantial, and arises from the testimony of the two witnesses, Walker and Bennett. (The Chief Justice here reviewed their testimony, and the effect of it.) Its tendency is to charge defendant with the crime of wilfully putting in jeopardy the lives of one hundred and thirty passengers; a crime that ought to banish him from society, as unfit to live among men. These remarks are made to apprise the jury of the importance of being fully satisfied by the testimony on this point, before they allow it to influence their verdict. They should also consider the evidence offered to contradict these witnesses. The testimony of these witnesses, though contrary, does not necessarily involve either in perjury, for both classes of witnesses may have sworn conscientiously, yet one or both may have been mistaken.

2. Did the collision arise from negligence or want of skill? It is contended that the law of the river is the same with the law of the road, and that vessels in passing are bound to keep to the right. We fully accord with the authority cited in a note to Kent's Commentaries and referred to by plaintiffs' counsel. (3 *Kent Com*. 231, *note*.) The law of the road is that where two carriages meet on the public road, to avoid collision each shall keep to the right. So in

reference to steamboats meeting each other head on, and there is not room to pass without changing course, each should go to the right. But in either case if there be room to pass, a carriage or a boat, though on the wrong side of the road or river, is not bound to go entirely out of her track to get around another carriage or vessel which is so far out of her direct route that keeping right on would cause no collision to either, merely in order to pass to the right.

In reference to the mode of sailing or running steamboats on the river Delaware, by the custom as proved, as well as by the principles of common sense, vessels going against tide keep *in shore* out of the strength of the tide; whilst vessels going with the tide keep *out* in the strength of the tide. This is manifestly right, and properly enters into the consideration of the jury in ascertaining whether the plaintiffs' boat and the defendant's were run with proper prudence and caution, or which of them was guilty of improper conduct. By the course of sailing vessels or running steamboats, particularly the latter, the Sun ought to have been in shore, and the Kent further out. If either of them was out of this, their proper track, it is, so far as it goes, evidence of the want of proper care and skill. And if the Sun was near shore, and the Kent met her there, and attempted to pass still nearer the shore and thus crossed her bows, the collision would have arisen from the fault of the Kent being in an improper position, and running across the bows of the Sun.

But it is still said that there was negligence on the part of the defendant in not providing proper look-outs, or pilots; and in not backing his engine as soon as he might. This depends on the proof. A steamboat navigating by night is bound to have proper lights, and proper look-outs, to use all proper precaution to avoid and prevent accidents; the want of these precautions would render them liable; but if these precautions were observed by both these boats, and the lights of either were not seen by the other, it will be for the jury to say whether this was for want of proper look-outs, or from the improper position of either boat in the river, or from intervening objects on shore. The fact that lights, which are proved to have been up, were not seen, may enable the jury by reference to the other proof, to fix the position of the boats at the time of the collision, and determine why the lights of the Kent were not seen by the Sun. If it was for want of proper look-outs the defendant is culpable; if from the improper position of the Kent in shore, and the consequent obstruction caused by intervening objects, as trees or houses on shore, the accident would be attributable to the plaintiffs.

Damages are in the discretion of the jury. If the jury think that this boat was run into by captain Whilldin, willfully and designedly, they would be justified in awarding vindictive damages to any amount which, in the exercise of a sound judgment and discretion, they deem proper, by way of public example. Considering the time; the occasion; the defendant's knowledge of the number of passengers; a wilful sinking of the Kent would evince a reckless disregard of human life deserving the severest punishment. But in proportion to the enormity of the act, the jury ought to be cautious in crediting such a design, and should require the clearest proof of it. Even in case of gross negligence, exemplary damages may be given.

If the jury think the collision arose from the negligence of captain Whilldin, or want of skill in him or his pilot, for all of which he is bound, the verdict should be for the plaintiffs, for compensatory damages; that which would pay them for repairing and placing their boat in as good condition as when he injured it; but the plaintiffs will not be entitled to recover for any supposed profits they might have made from passengers, any more than in an action for not completing a contract for conveying title, the supposed profits of the land should be taken into consideration.

If the collision was occasioned by the negligence or improper conduct of the plaintiff's boat, they of course are not entitled to recover anything; neither can they recover if it was a mere accident, and not caused by the improper act or neglect of either party. In such case the loss is without remedy.

Verdict for plaintiffs $1,875.

*Bates, Frame, Layton* and *J. M. Clayton,* for plaintiffs.
*Comegys, Gray* and *Gilpin,* for defendant.